24TH **JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON**

**STATE OF LOUISIANA**

NO. 820-839                                                DIVISION "H"

**NANCY ANDERSON; JOY MANGUNO; JAYME SONGY, AS CURATOR FOR MALVINA SONGY; AND JANICE VERDIN, AS RESPONSIBLE PARTY OF CATHERINE ROUSSELL; INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED**

**VERSUS**

**BOB DEAN, JR.; UPTOWN HEALTHCARE CENTER, L.L.C.; PARK PLACE HEALTHCARE, LLC; RACELAND MANOR NURSING HOME, INC.; MAISON DE'VILLE NURSING HOME, INC.; RIVER PALMS NURSING & REHAB, LLC; MAISON DE'VILLE NURSING HOME OF HARVEY, L.L.C.; ST. ELIZABETH'S CARING, L.L.C.; and BOB DEAN ENTERPRISES, INC.**

FILED:_____          _____
                                                           **DEPUTY CLERK**

**FIRST SUPPLEMENTAL AND AMENDED
PETITION FOR CLASS ACTION, INJUNCTIVE
RELIEF, AND DAMAGES**

NOW INTO COURT, through undersigned counsel, comes Plaintiffs, Nancy Anderson, on behalf of her mother-in-law, Mrs. Leona Anderson; Joy Manguno, on behalf of her deceased husband, Joseph T. Manguno; Jayme Songy, as curator for Malvina Songy; Janice Verdin, as responsible party for Catherine Roussell; and Henry Williams, as sponsor for his deceased mother, Katherine Williams ("Plaintiffs"), who bring this lawsuit, individually and as representatives of all those similarly situated, and represent as follows:

**PARTIES**

**1.**

Named as Plaintiffs and/or Proposed Representatives of the Plaintiff Class ("Petitioners") are:

A. Nancy Anderson is a person of the full age of majority domiciled in Jefferson Parish and appears on behalf of her mother-in-law, Mrs. Leona Hebert Anderson, who was a resident at defendant Park Place Healthcare, LLC ("Park Place") in Gretna,

1

EXHIBIT B

Louisiana. Nancy Anderson has power of attorney to act as attorney in fact for her mother-in-law and asserts rights as Leona Hebert Anderson's sponsor for the purposes of the Louisiana Nursing Home Residents Bill of Rights Act.

B. Joy Manguno is a person of full age of majority domiciled in Jefferson Parish and appears on behalf of her deceased husband, Joseph T. Manguno, a resident of Park Place in Gretna, Louisiana, and asserts rights as his sponsor for the purposes of the Louisiana Nursing Home Residents Bill of Rights Act.

C. Jayme Songy is a person of the full age of majority domiciled in Terrebonne Parish and is the nephew and court appointed curator for Malvina Songy, a 96-year-old resident of South Lafourche Nursing & Rehab and asserts rights as her sponsor for the purposes of the Louisiana Nursing Home Residents Bill of Rights Act.

D. Janice Verdin, a person of the full age of majority domiciled in Lafourche Parish and the niece of Catherine Roussell, a 67-year-old resident of South Lafourche Nursing & Rehab. Verdin is the designated "responsible party" for Catherine Roussell, and asserts rights as her sponsor for the purposes of the Louisiana Nursing Home Residents Bill of Rights. To the extent it is determined that Catherine Roussell lacks legal capacity, Ms. Verdin will be seeking judicial appointment as curator of Ms. Roussell as soon as the 17th Judicial District Court for Parish of Lafourche resumes operations.

E. Henry Williams, person of the full age of majority domiciled in Lafayette Parish and the son of Katherine Williams, a resident of South Lafourche Nursing & Rehab who tragically passed away during the events that are the subject of this petition. Mr. Williams is the sponsor of his deceased mother, Katherine Williams, and asserts rights as her sponsor for the purposes of the Louisiana Nursing Home Residents Bill of Rights. In due course, action will be asserted for the wrongful death and survival actions on behalf of Henry, his brother Joseph Williams, and any other statutory beneficiaries as a result of the death of Ms. Williams.

2.

The following parties are made Defendants herein:

A.   **Bob Dean, Jr.,** a natural person who resided in East Baton Rouge Parish at the time Plaintiffs' causes of action accrued.

B.   **Uptown Healthcare Center, L.L.C (operating under the tradename of Maison Orleans Healthcare of New Orleans)** a Louisiana limited liability company with its principal place of business located at 1420 General Taylor St., New Orleans, LA 70115.

C.   **Park Place Healthcare, LLC,** a Louisiana limited liability company with its principal place of business located at 535 Commerce St., Gretna, LA 70056.

D.   **Raceland Manor Nursing Home, Inc. (operating under the tradename of** South Lafourche Nursing & Rehab**),** a Louisiana corporation with its principal place of business located at 146 E. 28th St., Cut Off, LA 70345.

E.   **Maison De'ville Nursing Home, Inc. (operating under the tradename of** Maison De'ville Nursing Home**),** a Louisiana corporation with its principal place of business located at 107 South Hollywood Dr., Houma, LA 70360.

F.   **River Palms Nursing & Rehab, LLC,** a Louisiana limited liability company with its principal place of business located at 5301 Tullis Dr., New Orleans, LA 70131.

G.   **Maison De'ville Nursing Home of Harvey, L.L.C. (operating under the tradename of** Maison De'ville Nursing Home of Harvey**),** a Louisiana limited liability company, with its principal place of business located at 2233 Eighth St., Harvey LA 70058.

H.   **St. Elizabeth's Caring, L.L.C. (operating under the tradename of** West Jefferson Health Care Center**),** a Louisiana limited liability company with its principal place of business located at 1020 Manhattan Blvd. Harvey, LA 70058.

I.   **Bob Dean Enterprises, Inc.,** a Louisiana corporation with its principal place of business at 343 Third St., Suite 600, Baton Rouge, LA 70801. (Bob Dean, Jr. is

referenced herein as "Defendant Dean" and the seven nursing homes are collectively referenced herein as "Bob Dean, Jr. Nursing Homes").

J. **Louisiana Health Care Consultants, LLC,** a Louisiana limited liability company, with its principal place of business located at 343 Third St., Suite 600, Baton Rouge, LA 70801.

K. **DHNG, LLC,** a Louisiana limited liability company with its principal place of business located at 343 Third St., Suite 600, Baton Rouge, LA  70801.

L. **XYZ Insurance Companies**, the identities of which are presently unknown, yet which separately or together provide any, some or all of the Defendants insurance coverages for the acts, omissions, occurrences and/or liability of Defendants as set forth in this Petition.

M. Plaintiffs reserve the right to add additional presently unknown Defendants for which the identities become known through investigation and discovery, and which are liable jointly, severally, and *in solido* along with the other Defendants.

N. Together the Defendants, Bob Dean, Jr., the Bob Dean Nursing Homes, Bob Dean Enterprises, LLC, Louisiana Health Care Consultants, LLC and DHNG, LLC constitute a single business enterprise as a matter of fact and law, which is referenced in this Petition as "Bob Dean, Jr. and his companies."

## <u>JURISDICTION AND VENUE</u>

3.

The amount in controversy in this case and the subject matter upon which it is based are sufficient to justify jurisdiction in this Court pursuant to Louisiana Code of Civil Procedure Article 2.

4.

Venue is proper in this Court pursuant to Louisiana Code of Civil Procedure Articles 593, 42, 43, and 74 as at least part of the wrongful conduct occurred, and damages were sustained in

this Parish. Upon information and belief all residents of Bob Dean, Jr. Nursing homes are citizens of the State of Louisiana and therefore are not of diverse citizenship.

## **BACKGROUND**

5.

This is a class action for injunctive relief and damages on behalf of residents of nursing homes evacuated in the wake of Hurricane Ida to a warehouse in Independence, Louisiana, where they endured horrific and inhumane conditions due to the actions and negligence of Defendants. This action seeks redress in the form of injunctive relief under the Louisiana Nursing Home Resident Bill of Rights Act ("Residents Bill of Rights"), LSA R.S. 40:2010.6 *et. seq* and for damages arising from the general tort laws of Louisiana.

6.

Specifically, the claims herein are separate and distinct from any claim that any plaintiff, putative class representatives, and putative class members have against the Defendants for medical malpractice arising from Louisiana Revised Statute §40:1231.1 et. seq.  For the avoidance of any doubt, no party to this petition is individually asserting, nor are any putative class claims being asserted, for malpractice under Louisiana Revised Statute §40:1231.1 et. seq. Further, no party is asserting any claims in this petition that arise under any federal law or statute.

7.

Catherine Roussell, Malvina Songy, Joseph Manguno, Katherine Williams, and Mrs. Leona Hebert Anderson, represented herein by Plaintiffs, were among the at least 843 nursing home residents sent to a warehouse site spanning five tracts of land in Independence, Louisiana before Hurricane Ida to ride out the storm. This site consisted of a main warehouse, the "Waterbury Building," which is the primary location where the residents were confined during the relevant time periods, and other smaller "sub-warehouse" buildings (the land and the buildings located therein are referred to collectively as the "Waterbury Facility").

8.

The 843 residents came from seven nursing homes, all of which have ultimate common ownership by Bob Dean, Jr ("Defendant Dean"). Additionally, Defendant Dean was at all relevant times herein the ultimate owner of the Waterbury Facility where Defendant Dean directed the Bob Dean, Jr. Nursing Homes to evacuate residents. The employees of the Bob Dean, Jr. Nursing Homes were at all relevant times ultimately under the control, direction, and discretion of Defendant Dean and/or Defendant Bob Dean Enterprises, Inc and/ or Louisiana Health Care Consultants, LLC.. Upon information and belief, Defendant Dean controlled and directed the activities of the evacuation, location to which evacuation would occur, notification to state authorities regarding the evacuation, authority for supplies and staffing at the evacuation site, access to and refusal to permit access to the evacuation facility, and numerous other aspects central to this case, which will be developed during discovery and shown at trial.

10.

Upon information and belief, The Waterbury Facility has a municipal address of 129 Calhoun St, Independence, LA 70443. The Waterbury Company, which owned and operated the site before ceasing operations at the location in 2012, used the Independence facility in the manufacturing and packaging of pesticides. After operations ceased in 2012, the site was put in the care of the Windsor Investment Group, LLC until on or about June 23,2015, when Windsor sold the property to DNHG, LLC – an entity owned by Defendant Dean. Defendant Dean was therefore at all relevant times herein the ultimate owner of the Waterbury Facility.

11.

On March 14, 2015, the Windsor Investment Group, LLC informed the Louisiana Department of Environmental Quality ("LDEQ") that the Waterbury Facility would be used as an evacuation center for elderly assisted living facility residents, a decision to which LDEQ consented. It is unclear whether the Louisiana Department of Health ("LDH") was at any point given information about the prior use of the property to house and utilize toxic chemicals, or that the site is currently being monitored for ground water pollution as a result of the manufacturing

activities that once took place there.  Therefore, by definition, the Waterbury Facility is a toxic waste site.

12.

From the outset, Defendants intentionally misrepresented the evacuation plan for the Bob Dean, Jr. Nursing Homes, referring to the site in evacuation plans filed with state and governmental authorities as an "alternative care facility" rather than what it actually was – one large warehouse with concrete walls along with a few other smaller, metal-sided buildings – all of which were at a location that was being monitored due to the presence of toxic chemicals.

13.

Defendants notified Tangipahoa Parish officials that the Waterbury Building was designed to hold between 200 to 400 people and informed the officials that approximately 300 patients would be evacuated there. In fact, the building is an industrial warehouse that lacks the capacity to safely house 200 to 400 residents, especially considering the required COVID-19 protocols, if there was to be compliance with those mandatory protocols.

14.

The Defendants not only made these misrepresentations to relevant state and parish officials, but also to their own employees and representatives, who were told that the evacuation facility was an "old fruit of the loom warehouse" instead of a former manufacturing plant that still contained traces of toxic chemicals. Subsequently, in an interview with a local media representative, Bob Dean, Jr. perpetuated the misrepresentation of the nature of the Waterbury Building when he stated that the building was "an old Febreze factory."  In fact, the tracts on which the Waterbury Facility is located are believed to be contaminated with Vinyl Chloride and possibly 1,1-Dichloroethylene ("DCE").

15.

As of the filing of this pleading, not one of Bob Dean, Jr., his companies, or persons acting on any of their behalf, has advised residents or their family members (including each of the plaintiffs in their capacities as "sponsor", under the Residents Bill of Rights, among other

capacities), that residents would be evacuated to a toxic waste site or were, in fact, confined at a toxic waste site.

16.

In addition, neither residents, nor their constituents or family members have been advised of the potential chemicals to which the residents confined at the Waterbury Building site might have been exposed; the risk of harm presented by such exposure; signs, symptoms and warnings that should accompany those potential exposures; any evaluations of the residents that should be done to test for any harmful effects; or any indication of the increased risk of injury, harm, great bodily harm and death that is possible due to such potential exposures.

17.

The Defendants also chose not to inform family members, or other constituents of the residents, of the planned evacuation or where the residents were being taken. Families who went to extreme lengths and great effort before the storm to find out the plan for the residents were finally able to speak with a representative of Defendant Dean, or a representative of one of the Bob Dean, Jr. Nursing Homes, and were told that their loved one would be moved to an allegedly hurricane-proof building in Tangipahoa Parish with suitable accommodations for the resident population and all needed medical supplies available.

18.

The statements regarding evacuation plans, destination, and suitability of the evacuation facility made by agents, employees, or representatives of Defendants were made with the lack of due care and diligence which even careless persons are accustomed to exercise.

19.

The Waterbury Building was ill equipped to house anywhere near 843 nursing home residents, many of whom suffered from profound disabilities, both physical and mental. As an example, upon information and belief, staff from one nursing home brought two crash carts and

one emergency medicine box while other nursing homes brought no emergency supplies at all. Thus, there were a mere two crash carts for at least 843 residents, which was woefully deficient under these circumstances.  The large number of residents compared to the small number of resources also led to food being rationed among the residents to such an extent that the portion each resident received was smaller than what would typically be provided to a kindergarten student.

20.

Moreover, according to Bob Dean, Jr. in a recent press interview, Bob Dean, Jr. and his companies relied on the charity and kind consideration of a charitable service provider local to the Tangipahoa Parish area to provide some of the meals to residents rather than take reasonable, prudent, and necessary measures to assure that sufficient and nutritious food products were available for all residents that Bob Dean, Jr. and has companies confined in the Waterbury Buildings from August 27, 2021 through at least September 1, 2021. Nevertheless, Bob Dean, Jr. and his companies charged handsomely, often in advance, for providing custodial care of the residents, which included services such as providing food and water for the residents; and in fact, had been paid monies for doing do during the period of time that the residents were confined in the Waterbury Building.

21.

Bob Dean, Jr. and his companies, and persons acting on their behalf, also failed to provide adequate and appropriate health care and protective and support services to the residents during the evacuation period, including but not limited to failing to provide services consistent with the resident care plan; failing to implement proper social distancing to prevent the spread of COVID-19; failing bring with them, or have available, personal protective equipment such as masking to prevent the spread of COVID-19, sufficient medications to meet the prescription medication requirements of each of the residents and failing to bring medical records and properly documented medical histories for each the residents upon their departure from the various Bob Dean, Jr. Nursing Homes.

22.

At least 843 residents from the Bob Dean, Jr. Nursing Homes were relocated to, and confined in, the Waterbury Building. To prepare the Waterbury Building to house the large number of residents, Defendants, specifically Defendant Dean and representatives of Bob Dean, Jr. Enterprises, Inc. and Louisiana Health Care Consultants, LLC., directed staff to set up cots without any regard whatsoever for the social distancing measures of the required COVID-19 protocols. A large number of mattresses were placed on the floor, toe to toe and side by side, with little to no space between them.



23.

No reasonable steps or measures were taken or accomplished by Defendants to prepare the Waterbury Building with sufficient resources or accommodations for the residents in a way that offered residents any semblance of privacy or confidentiality or accounted for residents' basic personal hygiene needs and basic human dignity. There were only four sinks and ten to twelve showers available to the 843 residents, plus staff.  The only bathrooms were a small number of port-a-lets, which were placed in the same location as the "feeding area" for residents.

24.

Bob Dean, Jr. Nursing Home residents began to arrive at the Waterbury Building on Friday, August 27, 2021.

25.

There were several staff members of the various Bob Dean, Jr. Nursing Homes who relocated to the Waterbury Facility at Defendant Dean's ultimate direction, along with "corporate nurses" and other "corporate" employees and others acting on behalf of Defendant Dean and Bob Dean, Jr. Enterprises and Louisiana Health Care Consultants, though the total number of nurses, certified nursing assistants, dieticians and other necessary skilled workers was woefully deficient to care for the at least 843 residents crammed into the facility.

26.

As residents began to arrive, it was immediately clear there was insufficient space and beds for the large and excessive number of residents that Defendants chose to evacuate to the Waterbury Building. This fact would have been clear to any reasonable person exercising the most minimal degree of care or planning, prior to the evacuation. As a result, some residents were forced to sleep in their wheelchairs or other chairs they could find. Still other residents were forced to sleep on, or at least lie down on, the concrete floors. Incredibly, persons holding the title of "corporate nurse" reserved two and three mattresses each for themselves to ensure their own personal comfort.

27.

Things only worsened once the hurricane hit. Contrary to the assertions by Defendants and its representatives, the Waterbury Building was not "hurricane proof". As Hurricane Ida hit, rainwater began coming into the warehouse, which nurses attempted to contain, but to no avail. There was also loss of power for a lengthy period of time. The Waterbury Building was equipped with a generator, but representatives of Defendants informed staff members that the generator could not operate the lights and the air conditioning at the same time without breaking. The interior

lights remained on during the day and night, which meant that the air conditioning was used rarely, if at all.

28.

Very quickly, the temperatures rose due to the lack of air conditioning and poor ventilation. The odors, vapors and fumes emanating from the port-a-lets became putrid, to the point that staff members and residents alike would uncontrollably vomit and heave when sensing the odors, noxious vapors, and fumes off-gassing in the area.

29.

Outside of the obvious health concerns that could result from the heat and poor ventilation, the extent to which the flooding and loss of power may have exacerbated the potential for toxic exposures to residents is also a concern. Despite this genuine concern, Defendants perpetuated their pattern of concealing and otherwise omitting to disclose to the residents and their families the heightened concern that should have been displayed towards this vulnerable class of people in light of the fact that the Waterbury Facility was being monitored as a toxic waste site.

30.

Due to the water intrusion, a number of residents were on mattresses that began to float in the water. As a result, approximately 100 residents were required to be relocated to other areas within the facility, exacerbating the already overcrowded conditions. The residents and staff were terrified, particularly given the completely helpless nature of many of the residents and the powerless condition of the staff members, due to the woefully insufficient facilities, careless and reckless lack of planning and severe overcrowding of the already deficient facilities.

31.

After the hurricane hit the facility, the generators failed, and the already insufficient air conditioning system quit running, making the environment even more unbearable. Trash began to pile up.

 

32.

The excessive heat caused by the increasing temperature, lack of proper insulation in the building, and failed air conditioning system, coupled with the lack of sufficient water and food supply caused many residents to suffer dehydration.

33.

Residents unsuccessfully called out to the representatives of Defendants for food, water, medicine, and to be relieved of their soiled diapers, clothes, and bed linens (for those who were provided linens), but their calls went unanswered.

34.

Many residents spent as many as six (6) days in the fetid warehouse with overflowing toilets and piled-up trash.

35.

Residents also suffered the undignified and mentally traumatic experience of seeing the bodies of deceased residents left in place in the warehouse for hours, or possibly longer, until the coroner was alerted and could safely come and pick them up.  Moreover, some families of deceased residents were never notified by Bob Dean, Jr. and his companies, of the location of their loved ones' remains, and were forced to search for themselves.

36.

At least seven (7) of the nursing home residents have lost their lives since this evacuation. Sadly, the number of fatalities continues to grow, as Mr. Manguno, one of the original named plaintiffs in this case, tragically passed away on September 14, 2021. At least fourteen (14) more residents were hospitalized for their injuries and severe degradation of the medical conditions. Unfortunately, it is likely that additional deaths and hospitalizations of residents will occur as a direct and proximate result of the fault of Defendants.

37.

Henry and Joseph Williams were among the families of these deceased residents who were not given any timely notice of their loved one's passing and spent over a week searching for their loved one's remains.

38.

Defendants failed to properly inform Louisiana Department of Health ("LDH") officials of the deteriorating conditions at the site or the need for immediate assistance.  In fact, upon information and belief, Bob Dean, Jr. refused to permit access to the facility by State officials.

39.

LDH officials ultimately received reports from caregivers at the scene of people lying on mattresses on the floor, not being fed or changed and not being socially distanced to prevent the spread of the coronavirus.

40.

On Tuesday, August 31, 2021, representatives of LDH arrived to investigate the warehouse.

41.

Upon information and belief, Defendant Dean personally demanded that the LDH representatives leave immediately and refused to allow them and other State of Louisiana authorities to enter the warehouse.  Specifically, Defendant Dean personally refused to permit State inspectors to enter his facility and demanded that they get off his property.

42.

The LDH describes the scene encountered by its inspector of overcrowding patients many of whom slept on the floor with inadequate ventilation and supplies of food and medicine where waste and trash began to pile up.  The LDH concluded that the actions of Defendants in the days following landfall "clearly establish cruelty or indifference to the welfare of the residents."  LDH also concluded that by "August 30-31, 2021, post-landfall, the situation was clearly deteriorating to the point where surveyors could smell feces and urine, residents were in various states of dress, some even lacking clothing, with diapers full of feces, and general overcrowding.  Some residents implored staff for help to no avail.  At that state, any reasonable person would have reached out for help with a simple call."

43.

By Wednesday, September 1, 2021, accompanied by Louisiana State Police, LDH officials finally came to rescue the abused residents, and shut down the warehouse. At the time of their rescue, many residents were in the same clothes, hospital gowns, linens, and diapers that they had on when they arrived at the facility days earlier.

44.

At least part of the reasons for the delay in rescuing the residents was caused by Defendant Dean launching what LDH officials called a "campaign of threats, intimidation, and attempts at interfering with LDH's ability to properly assess the site and assure the safety of residents at the site." This campaign by Defendant Dean included sending bizarre and threatening text messages to several people associated with the LDH who were trying to assess the situation.

45.

Residents who were rescued were transited by State officials, and persons acting on behalf of the State, to various nursing homes across Louisiana, a process which continued into Thursday, September 2, 2021. Incredibly, the responsible parties for the residents were not properly notified by the Bob Dean, Jr. Nursing Homes, Defendants, or others acting on their behalf, of the circumstances of the relocation or the current whereabouts of their loved ones.  Instead, persons seeking information about residents of Bob Dean, Jr. Nursing Homes have been forced to rely

largely on media reports, social media and indirect information. Upon information and belief, Defendants' failures in this regard continue as of the filing of this pleading.

46.

Defendants' failure to provide adequate and appropriate health care and protective and support services, including but not limited to services consistent with the resident care plan to the Bob Dean, Jr. Nursing Homes residents has continued even after the residents were relocated, as it is believed as of the filing of this petition Defendants have failed to provide prescription medication requirements, medical records, and other relevant medical information regarding the residents to the nursing homes or other locations where the residents were relocated by state officials.

47.

On or about September 7, 2021, the LDH made the decision to revoke the licenses for the Bob Dean, Jr. Nursing Homes based on the LDH's observations of the Waterbury Facility and what the department considered "substantial noncompliance with the LAC requirements in accordance with the nursing home licensing law." However, in light of the ongoing recalcitrance of Defendants to act as required and provide critical information, there is a serious threat that these Defendants will disregard the revocation of their licenses and continue to impede an accurate assessment of the evacuation by, among other things, destroying evidence.

48.

Jayme Songy was never provided an accurate location for the whereabouts of Malvina Songy, by Defendants or persons acting on their behalf. Ms. Malvina Songy is elderly and unable to independently reach out to Jayme Songy. Through his own diligent, extensive, and tireless efforts, Mr. Songy located Malvina Songy, despite the utter failures of Defendants. Many similarly situated persons have not been notified of the whereabouts of their resident, and as of this filling do not know where their loved ones are located or the condition their loved one is in.

49.

Showing no signs of remorse, Bob Duet, who upon information and belief is the administrator at South Lafourche Nursing and Rehab, gave an interview on September 6, 2021, to

102.7 FM. During this interview, he made the remarkable claim that almost every resident and family is calling and "begging" to come back to his nursing home, and that he knows who the employees are who are "spreading lies" about the disaster evacuation.

50.

Defendant Dean's statements on the evacuation are even more troubling, as he has been quoted as saying, "We only had five deaths within the six days. Normally, with 850 people, you'll have a couple a day. So, we really did good on taking care of people."

51.

Defendant Dean's behavior during the evacuation was so erratic that the State Department of Health, in revoking the licenses of the Bob Dean, Jr. Nursing Homes, attached a bizarre text chain from Defendant Dean and characterized his behavior as "vile, repulsive, and lacking in any professionalism."

52.

In the aftermath of the evacuation from the Waterbury Facility, there have been reports that officials at the Bob Dean, Jr. Nursing Homes have refused family members access to collect their resident's possessions that were forced to be left behind when they were relocated from their respective nursing homes at a moment's notice. Personal items like decades old marriage photos that are valuable and irreplaceable family items are now exposed to the elements and an unstable owner, who has apparently decided to "sell the businesses" and may have ordered the homes to be cleared out.  Similarly, some residents that managed to bring some of their personal belongings with them to the Waterbury Facility had to leave them behind in the relocation process and have not been able to have them retrieved. There is a belief that Defendants, or persons acting on their behalf, have, or soon will destroy, discard, or otherwise improperly transfer residents' possessions and personal belongings.

## CLASS ACTION ALLEGATIONS

53.

Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

54.

Petitioners propose bringing this matter as a class action against Defendants on the issue of injunctive relief, liability, and damages.

55.

Petitioners propose to proceed on behalf of the following class of individuals:

All Bob Dean, Jr. Nursing Homes residents who are citizens of Louisiana (and any legal representatives thereof, including sponsors under the Louisiana Nursing Home Residents Bill of Rights Act) who were evacuated to the Waterbury Companies warehouse in Independence, Louisiana as a result of Hurricane Ida.

56.

Plaintiffs reserve the right, with leave of Court if required, to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified. Excluded from the Class of Plaintiffs are governmental entities; the Defendants; any entity in which Defendants have a controlling interest; Bob Dean, Jr. Enterprises or parent companies or entities, top level management of the Bob Dean, Jr. Nursing Homes, including the Administrators and Directors of Nursing and similar managerial level employees of the Bob Dean, Jr. Nursing Homes, affiliates, legal representatives, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. The following are specifically not excluded:   Bob Dean, Jr. Nursing Homes employees who were not the Directors of Nursing or similar top-level managers.

57.

Petitioners and all those similarly situated are entitled to have this cause of action maintained as a class action pursuant to La. C.C.P. art. 591.

58.

Defendants' acts and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class and any subclasses the Court might find to be appropriate.

59.

All members of the Class and any subclasses were and are similarly affected by the Defendants' acts and omissions, and the relief sought herein is for the benefit of Plaintiffs and members of the Class and any subclasses.

60.

Based on the number of residents evacuated, which is at least 843, it is apparent that the number of plaintiffs in both the Class and any subclass(es) is so large as to make joinder impractical, if not impossible.

61.

Questions of law and fact common to the Plaintiff Class and any subclasses exist that predominate over questions affecting only individual members, including, inter alia:

a. Whether the Defendants, or any of them, have engaged in conduct prohibited by applicable law, including, but not limited to the Residents Bill of Rights (LSA R.S. 40:2010.6 *et seq.* and Louisiana Civil Code Article 2315;

b. Whether the Defendants breached their fiduciary duty of care to plaintiffs and similarly situated plaintiffs;

c. If the Court determines the Defendants, or any of them, have in fact engaged in violations of the applicable law, whether an injunction should be issued ordering those Defendants to cease and desist any and all actions or behaviors in furtherance of the violations;

d. Whether Defendants disclosed or concealed essential descriptions of the evacuated premises; and,

e. Whether Defendants should be enjoined from further operations.

62.

The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Plaintiff Class and any subclass, as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class and any subclasses is common to the members of each.

63.

Plaintiffs will fairly and adequately represent and protect the interests of the members of the Plaintiff Class and any subclasses.

64.

Class representatives will be formally designated consistent with scheduling orders handed down by the Court.

65.

Plaintiffs have retained counsel who are competent and experienced in class action litigation.

66.

Certification of this matter as a class action is appropriate under Louisiana Code of Civil Procedure Article 591 because the questions of law or fact common to the respective members of the Class and any subclasses predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for a fair and efficient decree of the claims.

67.

Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class or any subclass would be able to protect their own interests because the cost of litigation through individual lawsuits.

68.

This action is properly maintainable as a class action under Art. 591(B)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or

varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants. Additionally, this action is properly maintainable as a class action under Art. 591(B)(1) because adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications.

69.

This action is properly maintainable as a class action under Art. 591(B)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.   Alternatively, the Louisiana Nursing Home Residents Bill of Rights claims for injunctive and attendant relief set forth in this action is maintainable as a class a under Art. 591(B)(2).

70.

Alternatively, this action is properly maintainable as a class action under Art. 591(B)(3) because questions of law or fact predominate over any questions affecting individual class members, and a class action is superior to other methods in order to ensure a fair and efficient adjudication of this controversy because, in the context the asserted claims herein, individual Plaintiffs lack the financial resources to vigorously prosecute separate lawsuits against large corporate defendants. Class litigation is also superior because it will preclude the need for unduly duplicative litigation resulting in inconsistent judgments pertaining to Defendants' policies and practices. There does not appear to be any difficulties in managing this class action.

71.

A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender.

72.

The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## CAUSES OF ACTION

### VIOLATIONS OF THE LOUISIANA NURSING HOME RESIDENTS BILL OF RIGHTS ACT

73.

Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Petition. The following non-exhaustive actions and inactions by Defendants, or those acting on Defendants' behalf, all constitute violations of the residents' right to be treated with dignity and amount to breaches and violations of the Plaintiff class's rights under the Residents Bill of Rights LSA-R.S. 40:2010.6, *et seq*:

a. By failing to timely advise the residents and or their families of the evacuation plan to Independence, as well as the option for the residents' families or responsible parties to come get the resident, Defendants deprived residents of their right to knowledge of their available choices.

b. By failing to disclose to the residents of the Bob Dean, Jr. Nursing Homes and their families and representatives that the Waterbury Facility had served as a manufacturing facility that contained toxic chemicals and is in fact still being monitored for the presence of toxic chemicals, Defendants deprived residents from exercising their right to make an independent personal decision about evacuating to the facility.

c. By failing to advised of the potential chemicals to which the residents confined at the Waterbury Building site might have been exposed; the risk of harm presented by such exposure; signs, symptoms and warnings that should accompany those potential exposures; any evaluations of the residents that should be done to test for any harmful effects; or any indication of the increased risk of injury, harm, great

bodily harm and death that is possible due to such potential exposures, Defendants deprived residents of the right to receive adequate and appropriate health care and protective and support services, including but not limited to services consistent with the resident care plan; and the right to have any significant change in his health status immediately reported to him and his legal representative or interested family member.

d.  By failing to adequately supply the Waterbury Facility with adequate amounts of food, supplies, resources, and staffing, Defendants deprived residents of the right to receive adequate and appropriate health care and protective and support services, including but not limited to services consistent with the resident care plan.

e.  By failing bring with them, or have available, sufficient medications to meet the prescription medication requirements of the residents and failing to bring medical records and properly documented medical histories for the residents upon their departure from the various Bob Dean, Jr. Nursing Homes, Defendants deprived the residents of the right to receive adequate and appropriate health care and protective and support services, including but not limited to services consistent with the resident care plan; as well as the right to be adequately informed of his medical condition and proposed treatment.

f.  By failing to prepare the Waterbury Building in compliance with COVID-19 protocols, Defendants deprived the residents of the right to be treated courteously, fairly, and with the fullest measure of dignity; as well as the right to receive adequate and appropriate health care and protective and support services, including but not limited to services consistent with the resident care plan.

g.  By failing to have enough beds for the residents, thus forcing some residents were forced to sleep in their wheelchairs or other chairs they could find, or even lie down on the concrete at times, Defendants deprived the residents of right to be treated courteously, fairly, and with the fullest measure of dignity.

h.  By failing to ensure the facility had enough bathrooms and sinks for residents, Defendants deprived the resident of the right to have privacy of the resident's body maintained during but not limited to toileting, bathing, and other activities of personal hygiene.

i.  By ignoring the residents' calls for food, water, medicine, and to be relieved of their soiled diapers, clothes, and bed linens (for those who were provided bed linens), Defendants deprived residents of the right to receive a prompt response to all reasonable requests and inquiries.

j.  By making residents suffer the undignified and mentally traumatic experience of seeing the bodies of deceased residents left in place in the warehouse for hours, or possibly longer, Defendants deprived the residents of the right to be free from mental abuse.

k.  By refusing to allow the LDH officials access to the Waterbury Facility, Defendants deprived the residents of the right to be granted immediate access to any representative of the state acting pursuant to his duties and responsibilities under state or federal law.

l.  By failing to provide prescription medication requirements, medical records, and other relevant medical information regarding the residents to the nursing homes or other locations where the residents were relocated by state officials, Defendants deprived residents of the right to be adequately informed of their medical conditions and proposed treatment; and the right to receive adequate and appropriate health care and protective and support services, including but not limited to services consistent with the resident care plan.

m.  By refusing to allow the residents or their representatives access to the Bob Dean Nursing Homes or the Waterbury Facility to collect any personal items belonging to the resident, Defendants are depriving residents of the right to be secure in

storing and using personal possessions, as well as the right to retain and use personal clothing and possessions.

74.

The actions and inactions of Defendants set out above, along with other actions and inactions that may be discovered during discovery, deprived Plaintiff class of their dignity, and constitute breaches and violations of the Plaintiff class's rights under the Residents Bill of Rights LSA-R.S. 40:2010.6, *et seq*.

75.

Although the violations apply to each resident as an "individual" violation in each instance, each violation, along with the nature and manner of the incredible pattern and practice of Bob Dean, Jr. and his companies' violations of the Bill of Rights, were common among the plaintiffs and putative class members; and the claims of these plaintiffs and class representatives (to be identified as required), are typical of those of the putative plaintiffs.

76.

Further, to the extent residents have been deprived of their personal property and belongings, all such actions by Defendants are or would be in gross and reckless disregard of the dignity of residents, as well as ongoing, independent but related, violations of the Residents Bill of Rights for each day the residents are not put back in full possession, control, and dominion of their property.

77.

As a result of these breaches and violations, the Plaintiff Class is entitled to recover all relief under the Residents Bill of Rights, including but not limited to injunctive relief preventing Defendants from further violating Residents Bill of Rights, attorneys fees, attendant relief and remedies provided the Residents Bill of Rights Act and costs pursuant to LSA-R.S. 40:2010.9.

78.

Pursuant to LSA-R.S. 40:2010.9, Plaintiffs have a cause of action for injunctive relief against Defendants as a result of these breaches and violations. Plaintiffs have obtained a Temporary Restraining Order from the Court, and there is a fixed hearing date of September 20,

2021, for a hearing and trial on the issuance of preliminary injunctive relief, pursuant to the Louisiana Code of Civil Procedure.

79.

Plaintiff Class seeks to enjoin Defendants from owning or operating a nursing home in the future and enjoining the Defendants from preventing the families and responsible parties of residents of the Bob Dean, Jr. Nursing Homes from knowing the location of the residents and communicating with the residents; requiring Defendants to provide prescription medication records and needs, and full and complete medical information on each resident, to each resident's new facility forthwith; to release the property of each resident to that resident or responsible person authorized to act on behalf of each residents, including patient account funds and advanced payments for services made to any of defendants, and to otherwise comply with each and every obligation required of Nursing Homes by the Louisiana Nursing Home Residents Bill of Rights Act.

## VIOLATION OF LOUISIANA'S GENERAL TORT LAWS

80.

Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

81.

Defendants' actions and inactions resulted in multiple individual violations of Louisiana tort law. Although the violations apply to each resident as an "individual" violation in each instance, each violation, along with the nature and manner of the incredible pattern and practice of Bob Dean, Jr. and his companies' violations of Louisiana tort law, were common among the plaintiffs and putative plaintiffs; and the claims of these plaintiffs and class representatives (to be identified as required), are typical of those of the putative plaintiffs.

82.

The actions of Defendants set out above in this petition were grossly negligent and constitute an extreme departure from ordinary care and willful, wanton, or reckless disregard for

the rights of others, entitling the Plaintiff Class to all damages and remedies under Louisiana's general tort law.

83.

Defendants Emergency Plan failed to comply with the standards imposed by the State including but not limited to the fact that the Waterbury Building facility, a toxic waste site, is wholly unacceptable as a pre-planned host site for a catastrophic emergency, particularly for the fragile and vulnerable residents over whom Bob Dean, Jr. and his companies had custodial care and fiduciary obligations.

84.

Other acts of fault, breach of custodial duty, negligence, gross negligence and willful misconduct that are developed during discovery and further investigation, and which are in violation of the standard of care for a custodian of persons similarly situated to Plaintiffs and similarly situated persons, including but not limited to, failing to provide adequate food and hydration, basic human needs, appropriate privacy, proper custodial care, cleaning and protection from further harm, all of which shall be shown at the trial of this cause.

**SINGLE BUSINESS ENTERPRISE**

85.

Defendants, Bob Dean, Jr., the Bob Dean, Jr. Nursing Homes, Bob Dean Enterprises, LLC, Louisiana Health Care Consultants, LLC, and DHNG, LLC, along with other possible entities now unknown to Plaintiffs and the putative class members, are a single business enterprise ("Bob Dean, Jr. and his companies").

86.

Bob Dean, Jr. has thorough and complete control and dominion over Bob Dean, Jr. and his companies, and throughout the events of which Plaintiffs complain and for which they seek redress, Bob Dean, Jr. has actually exerted operational and actual control over the Bob Dean, Jr. companies.

87.

Bob Dean, Jr. has publicly confirmed that he made the decisions to acquire the Waterbury Facility as the place to evacuate residents of the Bob Dean, Jr. Nursing Homes in the event of a desire to evacuate.  The Bob Dean Nursing Homes had no independent ability, authority, or autonomy to select or direct where residents of Bob Dean, Jr. Nursing Homes would be evacuated. Instead, the personnel, residents, assets and operational control of the Bob Dean Nursing Homes and the other Bob Dean, Jr. companies, property, assets, and personnel were inextricably interwoven and intermingled.  At all relevant times, one individual - Bob Dean, Jr., had the ability and authority to act, and actually acted with that ultimate authority, calling all of the shots as to the mandate that the Bob Dean, Jr. Nursing Homes residents would be evacuated to the Waterbury buildings.

88.

Bob Dean, Jr. Nursing Homes lacked sufficient resources to provide reasonable and prudent custodial care for the residents, both in terms of personnel and materials, which include, but are not limited to, bedding, privacy accommodations, toilets and sinks, sufficient quantity and quality of nutritious food, electricity accommodation, proper ventilation and air conditioning under the circumstances, water-tightness and flood protection safety (the lack of which Bob Dean, Jr. has confirmed was actually foreseeable by him), sufficient and adequate supplies of medications and medical supplies and equipment necessary to the custodial care of residents, clothing and personal hygiene materials for residents and staff, and multiple other issues and matters that will be shown at the trial of the matter.  Bob Dean, Jr. was the ultimate decision maker regarding the staffing, supplies, provisions, and accommodations to be provided residents, and the actual decision-making and responsibility began and ended with Bob Dean, Jr.

89.

Bob Dean, Jr. decided and authorized the amount of money to be paid to staff members of the Bob Dean, Jr. Nursing Homes and his other companies, and actually implemented promise to make those payments to staff, i.e. $6,000 per day per nurse.

90.

Bob Dean, Jr. Nursing Homes staff and the public at large were misled from the top about the true nature and condition of the Waterbury Properties.  Bob Dean, Jr. has continued to perpetuate the cover-up by publicly stating this his building – the Waterbury Facility – was a former "Febreze factory." Even though he knows, or is deemed to have knowledge, that the Waterbury Facility was used to make pesticides until approximately 2012, and since the State of Louisiana has required that it continuously monitor for well-known toxic contaminates on site. In fact, these critical, relevant, and material facts have been and continue to be concealed by Bob Dean, Jr. and his companies.  Standing alone, the directed usage of the Waterbury facilities and cover-up of its potentially dangerous and toxic nature, engaged in among Bob Dean, Jr. and his companies, reveals the singular nature of the control and dominion of Bob Dean, Jr. over the Defendants.

91.

In his public discussions, Bob Dean, Jr. typically collapses or conflates the Bob Dean, Jr. companies and properties, and their actions and inactions, as in the singular form, i.e. "I", "my" "me" and "mine."

92.

Similarly, Bob Dean, Jr.'s interactions with LDH during and following the evacuation and ultimate rescue of residents by state authorities re-confirms that the entities are singlehandedly and unilaterally controlled and directed from the top by Bob Dean, Jr.

93.

Bob Dean, Jr. in fact treated the defendant companies as his alter ego(s).

94.

Bob Dean Jr. and his companies have wrongfully and inaccurately suggested and/ or represented actual separateness of entities, by and through the formation of separate juridical entities, when, in fact, together they are actually engaged in the same business and other operations, have an identity of assets, are subjected to overall operational and actual control by Bob Dean, Jr., share a common corporate address, member/manager and designated representatives.

95.

Upon information and belief, all Defendant entities are commonly owned and administratively controlled by Defendant Bob Dean, Jr.

96.

The companies relative to the Bob Dean, Jr companies share a unity of interest and common ownership.

97.

The companies relative to the Bob Dean, Jr companies have allowed, and actually represent excessive business fragmentation, revealing that they are, in fact, a single business enterprise.

98.

The nature of the operation, oversight, control and other relevant aspects of the Bob Dean, Jr companies amount to a de facto merger and/ or consolidation of them into a single business enterprise.

99.

The companies relative to the Bob Dean, Jr companies share unified administrative control between them, to such an extent that they are a single business enterprise.

100.

Defendants, in fact, treat the assets and personnel of the Bob Dean, Jr companies as a single business enterprise.

101.

Other indicia that Bob Dean, Jr. and his companies are, in fact, a single business enterprise that shall be developed during investigation and discovery and shall be established at the trial of this cause.

## STATEMENT OF NOTICE

### 102.

Plaintiffs previously notified the relevant authorities and personnel with the State of Louisiana of Plaintiffs' intent to file their Petition and of the claims contained in it and have invited the State of Louisiana to formally intervene in these proceedings should it deem it necessary.

## REQUEST FOR A PROTECTIVE ORDER

### 103.

Plaintiffs seek a protective order that Defendants, all of their agents, assigns, and/or attorneys, or other persons acting or claiming to act on their behalf, be and are hereby temporarily restrained, enjoined, and prohibited from disposing of any records, documents, communications, including text messages and emails, and any other evidence related to the evacuation or the evacuation plan, or property of the Plaintiff Class in Defendants' actual or constructive possession and/or present at a nursing home.

## JURY DEMAND

### 104.

Plaintiffs demand trial by jury on all issues subject to trial by a trier of fact.

## PRAYER

WHEREFORE Plaintiffs, individually for Catherine Roussell and Malvina Songy, Joy Manguno, Mrs. Nancy Anderson, and Henry and Joseph Williams, and on behalf of all others similarly situated, pray for relief pursuant to each cause of action set forth in this Complaint as follows:

a.  For an order certifying that the action may be maintained as a class action, certifying the individuals formally designated (consistent with scheduling orders handed down by the Court) as representative of the Class, and designating their counsel as counsel for the Class;

b.  For an Order setting a class certification hearing as a preferential setting, given the age and infirmity of the residents involved;

c.  For a preferential setting of a trial date on the injunctive and attendant relief provided by the Louisiana Nursing Home Residents Bill of Rights Act;

d.  For an order of injunctive relief as follows:

(1) Enjoining Defendants from further violations of Plaintiffs' rights under the Louisiana Nursing Home Residents Bill of Rights Act including:

a.  The right to receive adequate and appropriate health care and protective and support services, including but not limited to services consistent with the resident care plan;

b.  The right to have privacy and confidentiality in caring for personal needs;

c.  The right to be treated courteously, fairly, and with the fullest measure of dignity;

d.  The right to be free from mental and physical abuse;

e.  The right to be free from any undue restraint; and

f.  The right to have significant changes in health status immediately reported to interested family members.

(2) Enjoining Defendants from owning or operating a nursing home in the future;

(3) Enjoining Defendants from preventing the disclosure of information related to the location of the nursing home residents;

(4) Requiring Defendants to provide forthwith full prescription and medical records of each resident to the new facilities at which each one is now located;

(5) Requiring Defendants to return forthwith all personal property of the residents or their family members to each resident or the responsible person for each resident, including but not limited to advance payments by residents to any of Defendants for services not provided, or funds owned or belonging to residents or their family members yet in the constructive possession of any of the Defendants

(6) Providing forthwith Plaintiffs' counsel the entire list of nursing home residents who were relocated, their respective responsible persons, as well as all known family

members and all known contact information for any of them so that efforts may be undertaken to assure that residents are reunited with their loved ones; and allowing Plaintiffs, through counsel, to informally communicate with these residents;

e.   For a protective order that Defendants, all of their agents, assigns, and/or attorneys, or other persons acting or claiming to act on their behalf, be and are hereby restrained, enjoined and prohibited from disposing of any records, evidence related to the evacuation or the evacuation plan, or property of the Plaintiff Class in their possession.

f.   For an award of all appropriate damages;

g.   For reasonable attorney's fees;

h.   For an award of costs; and

i.   For any other relief the Court might deem just, appropriate, or proper.

Respectfully Submitted:

**Robert E. Couhig, Jr. (#4439)**
**Donald C. Massey (#14177)**
**Jonathan P. Lemann (#26380)**
**Jason A. Cavignac (#27990)**
**Robert. E. Couhig, III (#29811)**
**Blair C. Constant (#33071)**
**R. Tate Martin II (#38045)**

**COUHIG PARTNERS, LLC**
3250 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
(504) 588-1288
(504) 588-9750 *fax*

*Attorneys for Plaintiffs*

**PLEASE SERVE:**

**Bob Dean, Jr.,**
3465 E Lakeshore Dr
Baton Rouge LA 70808

**Uptown Healthcare Center, L.L.C**
through its Registered Agent for Service,
Eric B. Landry,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**Park Place Healthcare, LLC**
through its Registered Agent for Service,
Eric B. Landry,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**Raceland Manor Nursing Home, Inc.**
through its Registered Agent for Service,
B. Troy Villa,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**Maison De'ville Nursing Home, Inc.**
through its Registered Agent for Service,
B. Troy Villa,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**River Palms Nursing & Rehab, LLC**
through its Registered Agent for Service,
Eric B. Landry,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**Maison De'ville Nursing Home of Harvey, L.L.C.**
through its Registered Agent for Service,
B. Troy Villa,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**St. Elizabeth's Caring, L.L.C.**
through its Registered Agent for Service,
B. Troy Villa,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**Bob Dean Enterprises, Inc.**
through its Registered Agent for Service,
B. Troy Villa,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**Louisiana Heath Care Consultants, LLC**
through its registered agent, L.L.C.
B. Troy Villa,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**DHNG, LLC**
through its Registered Agent for Service,
Eric B. Landry,
301 Main Street,
One American Place, 23rd Floor,
Baton Rouge, La 70801

**State of Louisiana**
through its Attorney General
300 Capital Drive
Baton Rouge, LA 70802